Filed 8/29/14  In re D.R. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.R. et al., Persons Coming Under the Juvenile Court Law. | B250924 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>S.C.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK43955) |

APPEAL from orders of the Superior Court of Los Angeles County, Julie Fox Blackshaw and S. Patricia Spear, Judges, and Marilyn Mordetzky, Juvenile Court Referee.  Affirmed.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

* * * * * * * *

D.R. and N.C. were removed from their mother, S.C., in December 2009, due to mother's substance abuse. For three and a half years, the children remained dependents while mother attempted to address her substance abuse problem. Mother visited the children regularly, but they were never returned to her as she was unable to achieve stability. Mother's reunification services were terminated, and the children were placed in a prospective adoptive home, where they thrived. Mother made three successive Welfare and Institutions Code section 388[1] petitions alleging a change in circumstances, due to her current sobriety and enrollment in another substance abuse treatment program. These petitions were summarily denied, and following a contested section 366.26 hearing, mother's parental rights were terminated. Mother appeals these orders, which we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2009, the Los Angeles County Department of Children and Family Services received a physical abuse referral for D.R. and N.C.'s sibling, two-year-old M.C. (who is not at issue here), after he was burned by mother's cigarette. Following a Team Decision Making meeting, mother agreed to voluntary family maintenance services, which included outpatient substance abuse treatment, parenting classes, a psychiatric assessment, and random drug testing.

Mother did not comply with the voluntary case plan. She failed to enroll in drug treatment and parenting classes, and tested positive for marijuana on September 18, October 7, October 20, November 24, and December 1, 2009. She was a no-show for a November 9 test. The Department was concerned for the safety of the children, as mother smoked cigarettes and marijuana in the home, and D.R. suffered from asthma. Mother was also neglecting the medical and dental needs of the children. Therefore, in December 2009, a section 300 petition was filed and the children were detained. At the time of their detention, D.R. was five years old and N.C. was 20 months old. All three children were placed with their maternal aunt.

---

[1] All statutory citations are to the Welfare and Institutions Code.

## 1.    The Department's Investigation

Mother told a Department Investigator that she had a medical marijuana card, and used marijuana to treat her overactive thyroid.  Mother admitted she smoked cigarettes in her apartment while the children were home, and that she smoked marijuana outside when the children were sleeping.  Mother also used PCP on a daily basis for nine years, until she became pregnant with D.R. in 2003.

At the December 10, 2009 detention hearing, the Department was ordered to set up drug testing for mother, and to offer reunification services to her.  Her visits were to be monitored.  As of the December 31, 2009 jurisdiction/disposition report, mother was visiting the children daily, fixing them lunch and putting them to bed at maternal aunt's house.  There were no problems or concerns with her visitation.

On January 6, 2010, mother enrolled in a substance abuse treatment program with the Cambodian Association of America.  She tested positive for marijuana on January 4, and was a no-show for tests on January19, February 3, and February 19.  By February 25, mother was no longer participating in her drug treatment program.  On March 8, 2010, she was still not enrolled in any substance abuse, counseling, or parenting classes, and was testing positive for marijuana.  At the March 10, 2010 adjudication and disposition hearing, the court ordered mother to participate in a drug rehabilitation program, random drug testing, parent education, and individual counseling to address her substance abuse and mental health problems.

At a June 29, 2010 Team Decision Making meeting, mother reported that she smoked marijuana with maternal aunt, and that maternal aunt allowed mother to watch the children, and maternal aunt's daughter, unsupervised.  Mother claimed she did not complete her drug program at the Cambodian Association of America because she did not have childcare.  Other maternal relatives confirmed that mother had the children when they were supposed to be living with maternal aunt.  Maternal aunt denied the allegations, but ultimately, her on-demand drug test came back positive for marijuana.  The Department filed a section 387 petition and removed the children from her care.  At

the next court hearing, M.C. was placed with his father.[2] M.C.'s father was authorized to supervise mother's visits with the children. Mother was found to be in partial compliance with her case plan. D.R. and N.C. were placed in foster care.

In July 2010, the Department reported that mother entered the Patterns Residential Recovery Center for Women and Children on June 8, 2010. Mother was "doing well." She had been terminated from her program at the Cambodian Association of America for noncompliance in June 2010, and had been evicted from her apartment. Mother started receiving individual counseling on July 22, 2010. Mother tested positive for marijuana on December 1, 2009, and January 4, 2010, missed tests on January 19, February 8, February 24, May 19, May 26, June 4, and June 24, 2010; and tested negative on December 16, 2009, April 12, June 30, July 12, July 20, and July 22, 2010. Mother had started parenting classes on June 15, 2010.

As of July 2010, mother's visits remained monitored. While the children were placed with maternal aunt, mother assisted with meal preparation, bathing, and putting the children to bed, and visited the children three times a week for four hours. Since entering the Patterns program, and the removal of the children from maternal aunt, mother's visits took place on Sundays, for four hours. The Department reported that mother was patient with the children, and interacted with them in a positive way.

When D.R. was interviewed by a Department Investigator in August 2010, and asked about drugs, he said mother smokes "when she freaks out." D.R. also said that mother made him smoke, and he pretended to hold and inhale a cigarette. When asked what it looks like when mother smokes, D.R. pressed his thumb and finger together, and said "cockaroaches."

Mother was discharged from her drug treatment program on August 30, 2010, for not following the program's rules. On September 14, 2010, mother entered the Flossie Lewis Center, a residential drug and alcohol treatment program. She "adjusted well" to

---

[2] M.C. has a different father than D.R. and N.C. In December, 2010, the juvenile court terminated jurisdiction as to M.C., giving sole physical custody to his father, and joint legal custody to mother and father.

the program, and made progress toward her treatment goals. All of mother's random drug tests were negative for the months of September, October, and November 2010.

Mother's visits remained monitored until November 2010, when she was granted unmonitored visitation. Her monitored visits went well; mother "shows her children lots of love. . . ." When her visits became unmonitored, mother visited with the children on Saturdays and Sundays, for at least four hours. Staff at mother's treatment program reported that mother's visits "seem to be going well" and that mother was "bonding well with her children." D.R. reported that he "enjoys visiting his mother; he likes to watch movies with his mother and spend time with her."

In December 2010, the Department reported that D.R. was engaging in aggressive behavior; he would hit other children in his foster home, and destroy their property. He was referred to counseling. Mother was in full compliance with her random drug testing obligations, and had completed her parenting program through the Flossie Lewis Center. Mother had also started to receive individual counseling. Mother was actively participating in her drug program at the Flossie Lewis Center, working with a sponsor to identify her triggers so she could maintain her sobriety.

In April 2011, the Department reported that mother completed her program at the Flossie Lewis Center on March 10, 2011. She submitted to 30 drug screening tests over the course of her enrollment in that program, and they were all negative. As part of that program, she also completed individual counseling and parenting classes. Mother transitioned to a one bedroom apartment on April 1, and had unsupervised overnight visitation with her children. Mother was a no-show for an April 19 drug test. However, tests on March 28, April 4, and May 9 were negative.

On April 24, mother was drunk and attacked M.C.'s father in M.C.'s presence, scratching his face. Both mother and father were arrested. On April 28, a new petition was filed as to M.C. Mother admitted she attacked M.C.'s father after he confronted her about being intoxicated while M.C. was in her care. Mother admitted she had relapsed while D.R. and N.C. were in her care during an unmonitored visit. Mother later changed her story and denied that she had been drinking. The police report showed that mother

had a blood alcohol content of 0.19/0.18 percent when she was arrested. Following mother's relapse and the domestic violence incident, her visits reverted to monitored.

On May 9, 2011, mother enrolled in an outpatient drug treatment program with the Substance Abuse Foundation of Long Beach. Nevertheless, on May 26, 2011, the juvenile court terminated mother's reunification services, and set a permanent plan of adoption for D.R. and N.C. Mother's visits remained monitored.

On September 22, 2011, mother filed a section 388 petition (not at issue in this appeal), requesting that the court reinstate reunification services. The petition alleged mother had participated in drug treatment, and tested negative for drugs and alcohol on May 13, 16, and 24, June 3, 13, and 22, and August 12, 2011. The juvenile court set the petition for hearing.

In October 2011, the Department reported that mother had completed all of the requirements of her drug treatment program on September 16. Mother enrolled for random drug testing with the Tarzana Treatment Center. She tested negative on May 9, June 13, July 12, August 8, and October 4, 2011. She was a no-show for tests on May 25, July 20, September 6, September 28, and October 17, 2011. Mother tested positive for alcohol on August 23, 2011. When confronted about the positive test, mother denied drinking.

Mother's monitored visits had been going well until October 23, 2011, when the foster mother arrived at mother's apartment to pick up the children, and the monitor (M.C.'s father) was not there. Moreover, the father of D.R. and N.C. was present, and was intoxicated. Mother admitted she made a mistake in allowing D.R. and N.C.'s father to visit the children. He was not present during the entire visit, but had come to deliver Halloween costumes to the children. Mother admitted father was drunk. After that, D.R. and N.C.'s foster mother monitored mother's visits. She reported that the children looked forward to seeing their mother. On November 22, D.R. told the social worker, "I want to go and live with my momma. I have fun at my momma's house." N.C. asked "When am I gonna go and live with my momma?"

6

On December 13, 2011, mother withdrew her section 388 petition, and it was dismissed without prejudice.

In March 2012, the Department reported that the children were likely to be adopted, and that the Department continued to look for an adoptive home for them. D.R. and N.C.'s foster mother was interested in adoption. When D.R. was asked how he felt about adoption, he said he liked living with his foster mother.

Mother maintained consistent supervised visitation with the children, and continued to submit to random drug testing. She also continued to attend weekly AA and NA meetings. Mother tested negative for drugs and alcohol on December 28, 2011, January 4, January 25, February 13, March 12, and April 23, 2012.

Mother visited with the children on Saturdays and Sundays. The visits went well; the "children really look forward to visiting with their mother." According to the foster mother, "[t]he children light up with joy and excitement when they talk about seeing their mother." D.R. told the social worker that he really likes his foster placement, but that he wants to live with mother again.

Ultimately, the foster mother changed her mind about adopting the children, because she had concerns about meeting their cultural needs. She also did not want to adopt the children because they were so bonded with mother. She was willing to provide permanency through legal guardianship. D.R. was reluctant to discuss adoption; he was focused on being returned to mother. The foster mother believed the children would benefit from an adoptive home that allowed them to stay in contact with their mother.

In a September 20, 2012 last minute information for the court, the Department reported that mother commenced unmonitored visits with the children on June 16, 2012.[3] However, her visits reverted back to monitored on September 18, 2012, because she failed to drug test on July 6, August 6, August 23, and September 10. Mother said she missed her July 6 drug test because she was working and her boss would not let her leave work. However, on July 25, mother told the Department that she lost her job and would

_____

[3]     On June 12, 2012, the court gave the Department discretion to liberalize mother's visits to weekends and overnight.

no longer miss any drug tests. Nevertheless, she continued to miss tests, even though she was no longer employed. Mother also did not return the Department's calls about her missed tests.

By December 2012, mother's visits had become less frequent, and mother no longer maintained consistent visitation. Her absence negatively affected D.R.'s behavior at school, and he was suspended.

In January 2013, the adoption social worker reported that she had been regularly discussing adoption with the children, and they were starting to "express[] comfort with the process." D.R. said he would like to be adopted if he could not be returned to his mother. Mother's visitation remained inconsistent, and D.R. continued to have behavioral problems at school.

In March 2013, the Department reported that a prospective adoptive family, Mr. and Mrs. H., had been found for the children. They resided in Sacramento, and had an approved home study. The children had two visits and regular telephone contact with the family, and started asking "when they can go live with their adoptive family."

On March 22, 2013, mother filed a section 388 petition (not at issue in this appeal), requesting reinstatement of her reunification services and unmonitored/overnight visitation. Mother had entered a sober living home on February 1, 2013. She moved to a different sober living facility on March 1, 2013. She was drug testing, and had four negative tests since February 1. The petition contended that the requested orders were in the best interests of the children because of the bond between mother and the children. The court set the petition for a contested hearing.

On May 30, 2013, the Department reported that mother's whereabouts were unknown. She had been discharged from her sober living house for noncompliance. Mother ignored the facility's curfew, argued with staff, and sneaked her boyfriend into the home. Mother also tested positive for methamphetamine when she entered the sober living house, but tested negative for all substances while she lived there. Moreover, mother had been arrested for prostitution in December 2012. When confronted with her arrest, mother admitted to prostituting herself to earn money to support herself.

8

Mother's visitation continued to be erratic. Mother did not visit or call the children from November 2012 to January 2013. Then she began to call to schedule visits, but did not show up, which caused D.R. to have additional problems at school. Mother resumed visiting the children in February 2013, seeing them twice a month in February and March. However, after a visit on April 7, mother had not seen the children at all before the hearing on her section 388 petition. She did not call D.R. on his birthday, but she did mail him a card.

At the May 30, 2013 hearing on mother's section 388 petition, the court denied the petition, finding the requested orders would not be in the children's best interests. (Again, that order is not the subject of this appeal.)

On July 1, 2013, mother filed her third section 388 petition, claiming to have been sober for two years. She asked the court to reinstate her reunification services. She claimed to need reunification services so she could access housing and drug testing resources. She had attempted to find housing and drug services, but could not afford them without reunification services. The trial court summarily denied the petition on July 30, 2013. On August 8, 2013, mother filed a "Notice of Intent to File Writ Petition," identifying the July 30, 2013 order (case No. B250924).[4]

The children were placed with their prospective adoptive family in Sacramento on July 2, 2013. Before moving to Sacramento, the children had three visits with the prospective adoptive parents in Los Angeles, and two overnight visits in Sacramento. All of the visits were enjoyable. N.C. referred to Mrs. H. as "mom." The children last visited mother on mother's day. She had not called to speak with the children in over a month.

On August 8, 2013, mother filed her fourth section 388 petition. She asked the court not to terminate her parental rights, and to reinstate reunification services. Mother contended she was currently enrolled in the Exodus Shields for Families program, was

_____

[4]     On September 18, 2013, mother filed a motion in this court to construe this notice as a notice of appeal from the juvenile court's July 30, 2013 order. We granted her motion on November 14, 2013.

9

employed, was attending group meetings, and testing regularly. She claimed she was stable and could provide for her children. Mother's petition included an employment verification letter from Charles Baird Insurance Agency, stating that mother had worked there part time since July 23, and that she was doing well, and they hoped to offer her full time employment once her class obligations for her drug program ended. The drug treatment program also submitted a letter. Mother was enrolled in the Shields Genesis Program, as she was pregnant. Shields is a comprehensive residential treatment program. Mother enrolled on July 22, 2013, and her drug tests had been negative.

Mother's petition was summarily denied on August 15, 2013. The juvenile court found that the proposed order was not in the children's best interests. Mother learned of the ruling at an August 23 hearing.

According to the Department's August 23, 2013 status review report, D.R. and N.C. were thriving in their prospective adoptive home. The children were offered telephone contact with their mother, but did not wish to speak with her or to see her. The foster parents were ready to adopt the children. D.R. told the Department that he "love[s] his new family." Mother was scheduled to have a visit with the children on August 16. The Department was making flight arrangements so she could visit them in Sacramento.

On September 25, 2013, mother filed her fifth section 388 petition. Mother asked for reinstatement of her family reunification services and that the court not terminate her parental rights. The petition alleged that mother was testing clean and was still enrolled in the Shields treatment program. She was also employed part time on weekends. She asserted the children would be happier with her. A progress report from her program showed that mother was admitted into the Shields Exodus program on August 5, and had been enrolled in the program for 44 days. She had no positive drug tests, and tested negative five times. Mother was cooperative, respectful, and compliant with her program. Mother's children could live with her at the program. Mother was still employed, and was doing well at her job. Maternal aunt also submitted a letter in support of mother's petition, asserting that mother is a good parent. A close friend of mother's

also wrote a letter in support of the petition, asserting that mother at times cared for his children.

On October 4, 2013, the trial court summarily denied mother's petition. Mother learned of the ruling at an October 9 hearing. On October 9, mother filed a notice of appeal, appealing the trial court's "10-9-13" and "8-23-13" orders (case No. B252027).

On October 9, 2013, the Department reported that since the children were placed with the prospective adoptive parents in Sacramento, mother had visited the children on August 6 and 30. The monitor (from the Sacramento family services agency) reported that the children appeared to enjoy their visits with mother. The children had also bonded well with their prospective adoptive parents.

In a December 30, 2013 interim review report, the Department reported that D.R. and N.C. were thriving in their prospective adoptive placement. The children referred to Mr. and Mrs. H as "mom" and "dad." D.R. says that Mr. and Mrs. H. love him and his sister, and take good care of them. Both children showed significant health improvements and developed healthy eating habits. Their academic performance had also improved. D.R. enjoyed one-on-one time with Mr. H., who took him golfing. D.R. was proud to have his own set of golf clubs. D.R.'s self-esteem and confidence had improved. The social worker noted that over the last year, the children had become more interested in adoption, and less focused on their mother. They were ready to be adopted by their prospective adoptive parents.

Mother visited the children on August 16[5], August 30, September 13, September 27, and October 25, 2013. The monitor's visitation notes reflected that mother was tearful during visits, and paid more attention to D.R. than N.C., causing N.C. to walk around to entertain herself. Mother was often upset, and D.R. would comfort her, and tell her not to cry. Also, mother made an inappropriate remark in front of D.R., stating "I don't know why he is choosing not to live with me, I let him do whatever he

---

[5]    It is unclear from the Department's reports whether the visit occurred on August 6 or 16.

wanted." However, mother could be redirected by the monitor. At the end of the visits, the children sometimes cried, and were sometimes disengaged.

Mother missed scheduled visits with the children on November 1 and November 8, 2013. She missed the November 1 visit because of the LAX shooting. On November 8, mother went to the wrong airline and missed her flight. Mother traveled to Sacramento to visit the children on November 15. D.R. did not want to go to the visit, and stayed home. N.C. was excited to visit, but mother was very upset that D.R. had not come, and had to be redirected to engage appropriately with N.C. D.R. also elected not to attend a November 22 visit with mother, but N.C. wanted to participate in the visit. However, mother missed her flight and did not show up at the scheduled time. Both children attended a December 6 visit with mother. Mother was appropriate, and the children appeared to enjoy the visit.

## 2.    Termination of Mother's Parental Rights

A contested section 366.26 hearing was held on December 30, 2013. Mother testified she visited the children twice a month while they were in Sacramento. Before the children moved to Sacramento, she saw them weekly. Before the children moved, she used to do homework, watch movies, and cook with them. She also would help put the children to sleep at night. The children were very happy to see her, and were sad when the visits were over. When mother first starting visiting the children in Sacramento, she observed that "the bond was not there . . . ." However, as she had more visits, the children were happy to see her. According to mother, "[w]e have a great bond." The children would call her "mama" and did not talk about their foster parents. When mother asked D.R. where he wanted to live, he told her he wanted to go home with her. N.C. also wanted to go home with mother when asked. The children looked a "little sad" when their visits with mother were over. Since the children moved to Sacramento, all of mother's visits were monitored.

Mrs. H. also testified. The children referred to her and her husband as mom and dad. The children wanted to be adopted.

12

Mother argued her parental rights should not be terminated because it would be detrimental to the children on account of her bond with them. (§ 366.26, subd. (c)(1)(B)(i).) Mother contended she had maintained consistent visitation with the children, and that there was a strong bond. The Department argued the children's interest in permanency outweighed any benefit of the bond with mother.

The court observed that mother had missed recent visits, and that D.R. had not wanted to see mother. The court found mother had ample opportunities to regain custody of the children and had failed to do so. Therefore, the court reasoned the children would benefit more from a stable home, where they were thriving. The court terminated mother's parental rights. Mother filed a timely notice of appeal from this order (case No. B253548). We consolidated all of mother's appeals under case No. B250924.

## DISCUSSION

Mother contends the trial court abused its discretion in summarily denying her last two section 388 petitions, reasoning she made a sufficient prima facie showing to merit a hearing. Mother also contends the trial court erred in terminating her parental rights, reasoning there was evidence she maintained regular visitation and shared a beneficial parent-child relationship, such that termination of her parental rights would be detrimental to the children. Respondent contends mother's notices of appeal for her section 388 petitions are inadequate. We liberally construe mother's notices to reach the merits of mother's contentions, but conclude neither of the claims raised on appeal compels reversal.

1. **Notices of Appeal**

Mother filed appeals from the rulings on her last three section 388 petitions. The first of these petitions was filed on July 1, 2013, and was summarily denied on July 30, 2013. On August 8, mother filed a "Notice of Intent to File Writ Petition" which identified the court's July 30 order. This court granted mother's motion to deem this notice as a notice of appeal. The second petition was filed on August 8, and was summarily denied on August 15, 2013. Mother learned of the denial at an August 23 hearing. The third petition was filed on September 25, 2013, and was summarily denied

13

on October 4. Mother learned of the denial of this petition at an October 9 hearing, and filed a notice of appeal that same day, appealing orders made on "10-9-13" and "8-23-13." Although mother's October 9 notice of appeal does not correctly identify the date of the orders appealed, we find it sufficient. Notices of appeal are to be liberally construed in favor of their sufficiency. (Cal. Rules of Court, rule 8.405(a)(3); see rule 8.100(a)(2).) The orders appealed from are the only appealable orders made close in time to the dates identified in the notices. Clearly respondent was not misled or prejudiced by mother's failure to correctly note the date that her petitions were summarily denied. (See, e.g., *In re Roderick U.* (1993) 14 Cal.App.4th 1543, 1547-1548, fn. 2.)

## 2. Section 388 Petitions

Although mother filed notices appealing the rulings on her last three section 388 petitions, she only provided argument in her appellate briefs concerning her last two petitions, filed in August and September. Accordingly, any claim of error as to the denial of her July section 388 petition has been waived. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

"Section 388 permits '[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court' to petition 'for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court' on grounds of 'change of circumstance or new evidence.' (§ 388, subd. (a).)" (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.) A parent must "establish[] by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. [Citation.] The parent bears the burden to show both a ' "legitimate change of circumstances" ' and that undoing the prior order would be in the best interest of the child." (*In re S.J.* (2008) 167 Cal.App.4th 953, 959.)

" ' "Since the interest of a parent in the companionship, care, custody, and management of his [or her] children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him [or her] adequate notice and an opportunity to be heard. [Citations.]" ' [Citation.]

14

[¶] . . . When a parent makes a prima facie showing of changed circumstances under section 388, he or she has a due process right to a full and fair hearing on the merits. [Citation.] . . . [Citation.] However, a parent's right to due process is 'limited by the need to balance the "interest in regaining custody of the minors against the state's desire to conclude dependency matters expeditiously . . . ." ' [Citation.] Accordingly, in dependency proceedings, '[t]he court must control all proceedings with a view to quickly and effectively ascertain[] the jurisdictional facts and all information relevant to the present condition and welfare of the child.' [Citation.]" (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1463-1464.)

Section 388 petitions are liberally construed in favor of granting a hearing to consider the parent's request. A parent need only make a prima facie showing to trigger the right to a hearing on the petition. A prima facie showing is made when a parent demonstrates facts which will support a favorable decision if credited by the court. " 'Whether [the petitioner] made a prima facie showing entitling [the petitioner] to a hearing depends on the facts alleged in [the] petition, as well as the facts established as without dispute by the [dependency] court's own file . . . .' [Citation.]" (*In re B.C.* (2011) 192 Cal.App.4th 129, 141.)

" '[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition. [Citations.] . . . .' [Citation.] [¶] The appellate court ' "will not disturb [a] decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' [Citation.]" (*In re Mary G.* (2007) 151 Cal.App.4th 184, 205.)

We find no abuse of discretion here. In support of her August 8 petition, mother submitted an employment verification letter and letters confirming her enrollment in a new drug treatment program. The employment letter, dated August 5, 2013, confirmed mother had been employed since July 23, 2013. The August 2, 2013 letter detailing mother's participation in drug treatment, confirmed mother had enrolled on July 2, 2013,

had drug tested weekly, and was compliant with the program.  The petition alleged the best interests of the children would be served by granting reunification because "I'm not a bad parent, I love my children[.]  I struggled in the beginning with stability which I am well stable now and able to provide love and necessities for my children."

Mother's evidence in support of her section 388 petition does not establish a prima facie case that her circumstances had changed, or that the proposed change would be in the best interests of D.R. and N.C.  (*In re Mary G.*, *supra*, 151 Cal.App.4th at p. 205.)  For years, mother engaged in a repeating cycle of enrollment in a treatment program, only to relapse after brief periods of sobriety.  Given mother's long-established pattern of obtaining treatment and stability, only to relapse again, her month-long enrollment in a new program, and her brief employment, hardly demonstrated that her circumstances had changed.

Moreover, there was no indication that continuation of mother's reunification services, in a case that had been pending for three and a half years at the time the petition was filed, would benefit the children.  (*In re Mary G.*, *supra*, 151 Cal.App.4th at p. 206 [" 'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.]' "].)  In the years the case had been pending, mother had never had the children returned to her care, and had only briefly achieved unmonitored visitation with them.  Mother's petition did not show that granting additional reunification services would do anything other than further delay permanency for her children.

In support of mother's September 25 petition, she submitted a progress report from her drug treatment program, a letter confirming her continued enrollment in drug treatment, five negative drug tests, an employment verification letter, earnings statements from mother's job, as well as letters of support from maternal aunt and a friend of mother's.  Mother alleged that the requested order would be in the best interests of the children because "[t]he children want a closer relationship with me and the distance that's

16

been put between us isn't good for our relationship and they would be happier with me . . . ."

Like the August 8 petition, mother's September 25 petition did not make the required prima facie showing. Although the petition showed that mother had continued in her program, for nearly three months, and that she maintained her employment, given mother's case history, this "change" was not compelling. Mother had already received reunification services for 18 months, and had failed to reunify with her children. Under these circumstances, notwithstanding any bond mother had with her children, additional reunifications services could not benefit the children, who had been dependents for nearly four years, and were finally thriving in their adoptive home and eager to be adopted.

### 3. Termination of Parental Rights

Mother contends the juvenile court should have applied the exception under section 366.26, subdivision (c)(1)(B)(i) to termination of parental rights because she maintained regular visitation with D.R. and N.C., and the children would benefit from continuing their relationship with her. We disagree.

If the court finds that a child should remain out of the custody of the parent and has terminated reunification services, the court shall terminate parental rights unless the court finds that termination would be detrimental to the child. One such circumstance exists where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

It is the parent's burden to show that termination of parental rights would be detrimental. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) "To meet the burden of proof for the section 366.26, subdivision (c)(1)[(B)(i)] exception, the parent must show more than frequent and loving contact or pleasant visits. [Citation.] . . . [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment from child to parent. [Citations.]" (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 953-954.) The relationship between the parent and child must be sufficiently significant that the child would suffer detriment from its

17

termination. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.) The court must balance the strength and quality of the parent-child relationship against the security and sense of belonging that a stable family would confer on a child. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811.) "If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250.)

Although mother had regularly visited the children over the years, most of her visits were monitored. Over time, the visits became briefer in duration, preventing mother from occupying a parental role in the children's lives. The children seemed to enjoy their visits with mother, but as time went by, mother did not actively engage with N.C. during visits, and D.R. stopped wanting to visit with mother. N.C. had been in foster care for most of her life, and D.R. had been in foster care for half of his life. Both children were thriving in their adoptive placement. Even though the children shared a bond with mother, this bond did not outweigh the benefits the children would achieve from the permanency of adoption.

## DISPOSITION

The orders denying mother's section 388 petitions are affirmed. The order terminating mother's parental rights is affirmed.


GRIMES, J.

We concur:

BIGELOW, P. J.




FLIER, J.


18